General Motors Acceptance Corporation, Appellant, vs. Commissioner of Banks, Respondent.*

*November 6—December 5, 1950.*

---

\* Motion for rehearing denied, with $25 costs, on February 6, 1951.

For the appellant there were briefs by *Adolph I. Mandel-ker* of Milwaukee, attorney, and *Jackson M. Bruce* of Milwaukee and *Anthony J. Russo* of New York City of counsel, and oral argument by *Mr. Bruce* and *Mr. Russo*.

For the respondent there was a brief by the *Attorney General, Roy G. Tulane,* assistant attorney general, attorneys, and *William E. Torkelson* of Madison of counsel, and oral argument by *Mr. Tulane* and *Mr. Torkelson*.

A brief was also filed by *Herbert C. Hirschboeck,* attorney, and *Whyte, Hirschboeck & Minahan* of counsel, all of Milwaukee, as *amici curiae*.

BROADFOOT, J.   The findings of fact made by the trial court are a brief statement of the facts herein, and are as follows:

"1. That at all times material petitioner General Motors Acceptance Corporation, hereinafter referred to as 'GMAC,'

was and is a foreign corporation duly licensed to do business in the state of Wisconsin with its offices at 606 W. Wisconsin avenue, Milwaukee, Wisconsin. That at all times mentioned herein all the capital stock of GMAC with exception of directors' qualifying shares, was and is owned by General Motors Corporation.

"2. That G. M. Matthews, who resides in the city of Madison, Wisconsin, is the duly appointed, qualified, and acting Commissioner of Banks of the state of Wisconsin.

"3. That continuously since 1936, GMAC has been and now is licensed in Wisconsin as a sales finance company and is engaged in the business of purchasing conditional sales contracts from automobile dealers holding franchises with General Motors Corporation.

"4. That GMAC purchases the conditional sales contract, signed by said automobile dealer, from the General Motors dealer, at a discount. In arriving at the total time price to a retail buyer under such instalment contract, the dealer adds to the cash-sale price a finance charge and also a charge for the cost of insurance, if there be any. For that purpose the dealer consults a rate chart furnished by GMAC and such chart is on file with the Banking Commission. The finance charge has been designated and is known as the 'time-price differential.'

"5. That for the past twenty-five years there has been active competition among finance companies for the privilege of purchasing both the contracts from General Motors dealers as well as other dealers who sell instalment contracts.

"6. That originally GMAC purchased said conditional sales contracts from said General Motors dealers with recourse and such dealers were required to make good to GMAC for any losses sustained in the event the automobile buyer failed to make payments called for by the contract.

"7. That during this time other finance companies were established and competed for the privilege of buying conditional sales contracts both from General Motors dealers and

other automobile dealers but upon a nonrecourse basis, and such companies were known as 'nonrecourse companies.'

"8. That to meet this competition the recourse companies, of which GMAC was one, established a practice of setting aside a part of the time-price differential which at stated periods was remitted back to the automobile dealer to reimburse him for any losses he may have sustained by reason of their dealing on a recourse basis; that such part of the time-price differential set aside for the dealer was known as the reserve, or 'dealer's reserve' or 'dealer's participation.'

"9. That for many years prior to 1935 the amount so remitted covered more than the losses incurred by such automobile dealers and became a source of profit to them. Shrewd automobile dealers began to shop around and place their business with the finance company that gave them the largest reserve out of a given instalment contract. Because of the keen competition between finance companies, certain abuses grew or developed in trying to obtain these contracts from dealers. These abuses were known as 'packs' and 'rebates' and became an excessive and a hidden expense to the automobile buyer.

"10. That the 1933 legislature, by resolution, authorized an investigation of finance companies and pursuant to such resolution the Banking Commission and an interim advisory legislative committee conducted such an investigation; that they submitted a report to the legislature of 1935 wherein they found that in many cases there were evils of excessive reserves which in reality were 'packs' and 'rebates.'

"11. That as a result of said report, the 1935 legislature enacted sec. 218.01; that one of the primary purposes of such enactment was to regulate these finance companies so as to protect the automobile buyer from the evils of 'packs,' 'rebates,' and 'excessive reserves.'

"12. That by later enactments to sec. 218.01 there was delegated to the Banking Commission the authority to make rules and regulations which would promote the interests of

retail buyers of motor vehicles and also gave to the Banking Commissioner the power to define unfair practices in the industry.

"13. That pursuant to such statutory enactment the Banking Commissioner promulgated rules and regulations, one of which purports to regulate 'dealer's reserve' or 'dealer's participation,' and is the rule that is the subject of this litigation. The provisions of the rule that are under attack read as follows:

" 'Rule II. Dealer participation.

" 'A. "Dealer participation" is defined as that portion of the charge contained in the rate charts on file with the Banking Department which is retained by or remitted or credited to the dealer by the finance company and shall also include any benefit from or part of any amount collected from any retail purchaser as a finance or insurance charge, which shall come to or be retained by a motor vehicle dealer on the sale or transfer, by such dealer, or a retail instalment contract of a motor vehicle. . . .

" 'D. Unreasonable dealer participation.

" '1. Any unreasonable or unconscionable dealer participation is hereby declared to be an unfair trade practice. Furthermore, any dealer participation in excess of the following is declared an unfair trade practice and unconscionable.

" 'a. Two per cent per annum for a period not to exceed eighteen months of the unpaid balance on any retail instalment contract of a new motor vehicle. A minimum participation of $8 may be given and a maximum participation not to exceed $20.

" 'b. Three per cent per annum for a period not to exceed eighteen months of the unpaid balance of any retail instalment contract of a used motor vehicle, the model of which is not over two years old. A minimum participation of $8 may be given, and a maximum participation of not to exceed $20.

" 'c. Five per cent per annum for a period not to exceed eighteen months of the unpaid balance of any retail instalment contract of a used motor vehicle, the model of which is over

two years old. A minimum participation of $8 may be given, and a maximum participation of not to exceed $20.

"14. That since August 1, 1925, GMAC has had many finance plans in effect and since that time has required that insurance in some form be provided all at the expense of the automobile buyer; that through its advertising, both to its dealers and to the public, it has always treated and considered insurance as an integral part of the cost of financing.

"15. That since August 1, 1925, up to the middle of 1945, the insurance provided for by the GMAC plan was written by General Exchange Insurance Corporation, hereinafter referred to as 'GEIC.' Originally the majority of stock of GEIC was owned by GMAC but since the end of 1935 GEIC has become and is a wholly owned subsidiary of General Motors Corporation. The insurance written by GEIC was at twenty-five per cent less than manual rates and written as a part of the GMAC instalment plan; this saving was passed on to the automobile buyer.

"16. That during the summer of 1941 Motors Insurance Corporation, hereinafter referred to as 'MIC,' was incorporated. It is a wholly owned subsidiary of GMAC and is engaged in the writing of insurance required by GMAC on all vehicles sold on its time-sales plan. MIC is licensed in this state to transact insurance business and the rates charged by it are standard or manual rates, the same as charged by stock companies for like coverages. MIC appoints as its agents the automobile dealers who hold franchises from General Motors Corporation and it pays to such agent a commission of twenty-five per cent of the premium so charged. GMAC on all insurance so written collects the insurance premiums from the retail buyers and remits the same periodically to MIC. MIC remits the insurance commissions to the dealer as allowed by Rule II.

"17. That MIC was incorporated in 1941 after the promulgation of Rule II; immediately a dispute arose between the Banking Commission and GMAC as to whether the insurance commissions paid by MIC to the dealers should be included as a part of 'dealer participation.' The Banking Commission determined that such insurance commissions should be included as part of 'dealer participation' and since December, 1941, GMAC has reluctantly complied with the rule.

"18. That GMAC suffers no monetary injury from Rule IIA or Rule II as presently applied and has no legally protectible interest involved in the present controversy."

The appellant takes no issue with the findings of fact but does challenge the conclusions of law. In its brief the appellant states the basic issue as follows:

"In view of the situation, the basic issue in this case narrows down to the question whether insurance commissions received by the dealer from an insurance company, under the circumstances involved in this proceeding, constitute dealer participation within the proper meaning and scope of that term. GMAC contends that they do not, and that the defendant is not empowered to enlarge or extend the concept and meaning of dealer participation by subjecting the insurance commissions to the defendant's regulatory power over dealer participation. If GMAC's position on that basic question is correct, it follows that the defendant, by construing and applying the definition of dealer participation so as to bring the insurance commissions under its regulation of dealer participation, has unlawfully asserted regulatory power over something which is not dealer participation."

In its memorandum opinion the trial court summarized the argument of the appellant as follows:

"When the dealer is authorized by the buyer to procure the insurance from MIC, and he sells the instalment contract to

the petitioner, he acts in two capacities; namely, (1) as a seller of the instalment contract to the petitioner, and (2) as a licensed insurance agent of MIC. The only benefit that accrues and is received by the dealer from the petitioner is the reserve with which he is credited and which he receives in connection with each instalment sales contract. Petitioner has no objection to the defendant fixing minimum and maximum amounts for this participation. The insurance commission which the dealer receives, while a benefit to him, is received in a different capacity and for a different service performed by him than the seller of a sales contract. He receives the insurance from MIC, a separate corporate entity, as its licensed agent for procuring the insurance. The commission paid by MIC to such dealer is the same compensation for the same service and function for which some other insurance company would compensate its agent if the retail buyer had purchased the insurance elsewhere. It is no benefit received from petitioner as a licensed sales finance company. The scope of dealer's participation must be measured by whatever benefit the dealer received from the petitioner."

The appellant made other arguments in detail to support its position. Each of its arguments is based upon the premise that appellant and its wholly owned subsidiary, Motors Insurance Corporation, are separate entities. If that premise is correct, its arguments have weight and are convincing. If the premise is wrong, then the opposite is true.

·The record reveals many instances of the close association of GMC, GMAC, and MIC: (1) MIC is a wholly owned subsidiary of GMAC; (2) MIC does not write complete automobile coverage but only writes insurance against fire, theft, and accidental physical damage to the car (including deductible collision). It writes only the insurance required by GMAC on vehicles sold on its time-sales plan; (3) no separate application for insurance is made to MIC. To write the insurance MIC obtains from GMAC its dealer's work sheet which contains the necessary information; (4) GMAC

advertises the insurance as part of a "one-package plan." It advertises to dealers as follows:

"The value of the plan to the dealer is apparent from the following comparison of the profit potential of two sales:

| "GMAC Plan | Bank financing |
| --- | --- |
| "Car sale | Car sale |

"Insurance commissions
"Dealer reserve
"Shop volume from insurance losses
"Insurance renewals
"Close customer relation
  "(a) Service sales
  "(b) Repeat car sales"

It advertises to the public as follows:

"Here's why we use the
"General Motors instalment plan
"Operated by GMAC
"Because you get  - - -
"1. Low cost
"2. Broad insurance protection
"3. Convenient 'one-package' transaction
"4. Flexibility—liberal treatment
"5. Local plus nationwide facilities
"6. Budget plans for accessories and repairs
"7. Friendly, courteous service
  "A complete and exclusive service for
     General Motors Customers."

(5) In the various documents used in the GMAC plan the insurance charges are referred to as "territorial charges." In one rate chart, Exhibit No. 42, the dealer is instructed to "consult GMAC branch for territory charge in all transactions involving tractors, trailers, semitrailers, and cars equipped to haul trailers." On another page of the same

exhibit, dealers are referred to the GMAC branch for territory charge on used cars, rather than to MIC.

There are other factual situations reflected in the record which indicate that GMAC and MIC are separate corporations in name only. In legal language each corporation is considered as a separate entity. Separate corporations with common stock ownership, however, should not be treated as separate entities if reasonable regulation is hampered thereby.

"Where the corporate form of organization is adopted or a corporate entity is asserted in an endeavor to evade a statute or to modify its intent, courts will disregard the corporation or its entity and look at the substance and reality of the matter. This has been applied to violations of laws against 'trusts' and combinations in restraint of trade and commerce, laws regulating public utilities, laws against rebating and overcharges, tax laws, and a workmen's compensation law. The courts will, conversely, refuse to regard corporations as the same in favor of one which seeks thereby to evade law or legal obligations." 1 Fletcher, Cyc. Corp. (perm. ed.), p. 170, sec. 45. See also *Milwaukee Toy Co. v. Industrial Comm.* 203 Wis. 493, 234 N. W. 748; *Minahan v. Timm,* 210 Wis. 689, 247 N. W. 321; *Palmolive Co. v. Conway* (D. C.), 43 Fed. (2d) 226; *United States v. Milwaukee Refrigerator Transit Co.* (D. C.), 142 Fed. 247.

The separate corporate entity of MIC is asserted for the purpose of paying car dealers added "dealer participation" indirectly under the guise of insurance commissions. In view of the above authorities a piercing of the corporate veil shows that in substance GMAC and MIC are only separate names for the same person and that the respondent is correct in his position.

*By the Court.*—Judgment affirmed.

The following opinion was filed February 6, 1951:

BROADFOOT, J. (*on motion for rehearing*). Upon the motion for rehearing, the petitioner, General Motors Acceptance

Corporation, states that, in its decision herein, the court made no reference to a constitutional question raised upon the appeal. The petitioner contended then, and does now upon this motion, that the ruling of the Commissioner of Banks and the decision of this court result in a denial to petitioner of the equal protection of the laws and a deprivation of its property without due process of law, each of which is guaranteed by the Fourteenth amendment to the constitution of the United States. Although it was not specifically referred to in the opinion, the court considered this contention and deemed it to be without merit.

*By the Court.*—Motion for rehearing denied with $25 costs.