Matthias, J.
The issues before this court for decision are:
I. Does the Eetail Installment Sales Act apply to automobile dealers so as to render them subject to a forfeiture of their licenses for a violation thereof?
II. Do the provisions of Section 1317.08, Eevised Code, limiting the amount a dealer may receive as a premium for the transfer or assignment of a retail installment contract to a financial institution violate his constitutional rights by depriving him of property (his freedom of contract) without due process of law or by denying him the equal protection of the law?
A retail installment contract, incidentally, is defined in Section 1317.01, Eevised Code, as “any written instrument which is executed in connection with any retail installment sale and is required by Section 1317.02 of the Eevised Code or is authorized by Section 1317.03 of the Eevised Code, and includes all such instruments executed in connection with any retail installment sale.” A retail installment contract usually con *451 sists of a promissory note and a chattel mortgage, and is referred to as “paper.”
With respect to the first question, we adopt the reasoning of the Court of Appeals, which is as follows:
“The Dealers’ and Salesmen’s Licensing Board is granted the following authority under Revised Code Section 4517.12:
“ ‘The board may suspend or revoke any license if the licensee has in any manner violated the rules and regulations issued pursuant to Sections 4517.01 to 4517.18, inclusive, of the Revised Code, or has violated # * * any law relating to the selling, taxing, licensing, or regulation of sales of motor vehicles. ’
“While Chapter 1317, Revised Code * * * [Retail Installment Sales Act] nowhere specifically mentions the sale of automobiles, or any other specific chattel, as being intended to be regulated by its provisions, it requires no difficult process of reasoning to conclude that the sale of all goods and chattels sold on an installment plan are governed and in effect regulated by its provisions.
“It is well recognized, and the evidence in the instant case substantiates the fact, that the great majority of all automobile retail sales are made on an installment basis. This fact is further emphasized by the frequent reference to installment sales, in Chapter 4517, Revised Code * * * [Automobile Dealers and Salesmen]. The ability of the retail seller of an automobile to successfully dispose of the time payment note he is required to accept is of prime importance to both the seller and the buyer. The balance of the provisions of Chapter 1317, Revised Code, supra, is also highly regulatory of the retail seller and substantially affects the retail automobile industry. The writer is therefore of the opinion that the violation of any of the provisions of Chapter 1317, Revised Code, supra, by a retail automobile dealer might very well subject him to a suspension or revocation of his license by the defendant board, in addition to the penalties provided in the act. The writer is further not impressed with the argument that the board would be without jurisdiction to so act for the reason that the statute under consideration carries its own penalty. If we were to carry this line of reasoning to its logical conclusion we would arrive at a point *452 where any professional man or other licensee could violate any penal statute at random without fear of suspension or revocation of his license by a board or court as may be provided in such instances by statute. The fact giving rise to suspension or revocation of a license is invariably based on the violation of some penal statute, ordinance or regulation.”
It is our conclusion regarding this question that the Retail Installment Sales Act is, in the words of Section 4517.12, Revised Code, a “law relating to the selling * * * or regulation of sales of motor vehicles,” and that a violation thereof may well subject the offender to a suspension or revocation of his license.
The next issue before the court is the constitutionality of that part of Section 1317.08, Revised Code, which limits the amount a retail dealer may receive as a premium for the transfer or assignment of a retail installment contract to a maximum of two per cent of the principal balance of said contract.
That part of Section 1317.08, Revised Code, which prescribes such limitation reads as follows:
“No person shall enter into any agreement with any retail seller regarding the purchase, assignment, or transfer of any retail installment contract whereby the retail seller shall receive or retain, directly or indirectly, any benefit from or part of any amount collected or received, or to be collected or received, from any retail buyer as a finance charge or as the cost of insurance or other benefits to the retail buyer, in excess of two per cent of the principal balance of the retail installment contract. No person shall, directly or indirectly, pay to the retail seller, and no retail seller shall, directly or indirectly, receive or retain any part of the amount collected, or to be collected, as a finance charge or retail buyer’s cost of insurance or other benefits on any retail installment contract purchased, assigned, or transferred from him, in excess of two per cent of the principal balance of the retail installment contract, provided this paragraph does not apply in case of a bona fide sale of a retail installment contract, if, as part of the consideration for such sale and purchase, the retail seller agrees to act, and does act, as agent for the purchaser in making collection of all ampunts due on and otherwise completely servicing said re *453 tail installment contract, including billing, posting, and maintaining complete records applicable thereto.
“* * m Any sale, assignment, or transfer of a retail installment contract in violation of this section is void. Except as specifically limited by this paragraph all instruments which are a part of a retail installment contract are freely assignable and transferable.”
The essential tests of constitutionality which legislation enacted pursuant to the police power must meet in order to be valid are (1) the legislation must concern an area in which government has a right to exercise some degree of control, (2) it must be reasonable and nondiscriminatory and (3) it must bear a substantial relation to the purpose sought to be effectuated. See Froelich v. City of Cleveland, 99 Ohio St., 376, 124 N. E., 212, and Nebbia v. New York, 291 U. S., 502, 78 L. Ed., 940, 54 S. Ct., 505, 89 A. L. R., 1469.
Section 1317.08, Revised Code, is but a part of Chapter 1317, Revised Code, entitled “Retail Installment Sales.” This chapter contains, in addition to the restriction in question, numerous restrictions, limitations, positive directives and quite severe penalties for a breach thereof (the voiding of agreements made in contravention thereof and a fine of up to one thousand dollars or imprisonment for one year, or both, are penalties included, and, as we have seen, the possibility of the suspension of the license of a violator). It is an undisputed fact, admitted by both counsel in their briefs and in their arguments to the court, that Chapter 1317 was enacted by the General Assembly in order to correct certain abuses existing in the field of dealer participation in the financing of sales made on the installment plan, which were so common, and that the abuses directly responsible for the legislation centered in the area of sales of automobiles, both new and used. Such unregulated dealer participation resulted in activities amounting to fraud on the general public in the nature of hidden and disguised profits included not in the sale price of the automobile but in the cost of the finance plan and later returned to the dealer in the form of a “reserve” or “kickback.”
For other cases not strictly in point but touching on the question of the abuses mentioned, see United States v. General *454 Motors Corp., 121 F. (2d), 376, and General Motors Acceptance Corp. v. Commissioner of Banks, 258 Wis., 56, 45 N. W. (2d), 83.
In the latter case the Supreme Court of Wisconsin adopted the findings of fact of the trial court which were, in part, as follows:
“5. * * * for the past 25 years there has been active competition among finance companies for the privilege of purchasing both the contracts from General Motors dealers as well as other dealers who sell installment contracts.
“7. * * * during this time other finance companies were established and competed for the privilege of buying conditional sales contracts both from General Motors dealers and other automobile dealers but upon a nonrecourse basis, and such companies were known as ‘nonrecourse companies.’
“8. * * * to meet this competition the recourse companies, of which GMAO was one, established a practice of setting aside a part of the time-price differential which at stated periods was remitted back to the automobile dealer to reimburse him for any losses he may have sustained by reason of their dealing on a recourse basis; that such part of the time-price differential set aside for the dealer was known as the reserve, or ‘dealer’s reserve’ or ‘dealer’s participation.’
“9. * * * for many years prior to 1935 the amount so remitted covered more than the losses incurred by such automobile dealers and became a source of profit to them. Shrewd automobile dealers began to shop around and place their business with the finance company that gave them the largest reserve out of a given installment contract. Because of the keen competition between finance companies, certain abuses grew or developed in trying to obtain these contracts from dealers. These abuses were known as ‘packs’ and ‘rebates’ and became an excessive and a hidden expense to the automobile buyer.” (Emphasis ours.)
Further findings of that court were to the effect that pursuant to a legislative investigation of these abuses a statute was enacted; “that one of the primary purposes of such enactment was to regulate these finance companies so as to protect *455 the automobile buyer from the evils of ‘packs,’ ‘rebates,’ and ‘excessive reserves’ and that “pursuant to such statutory enactment [and amendments thereof] the Banking Commissioner [of Wisconsin] promulgated rules and regulations, one of which purports to regulate ‘dealer’s reserve’ or ‘dealer’s participation,’ and is the rule that is the subject of this litigation. ’ ’
Although the actual question decided by the Supreme Court of Wisconsin dealt with an application of' certain of such restrictive rules and regulations, rather than the constitutional validity thereof, the court, in an opinion denying a motion for rehearing, stated that the contentions of GMAC, that it was by such rules and regulations deprived of property without due process of law and was denied equal protection of the law, were without merit.
The fact that the Wisconsin Legislature later chose to repeal that part of the statute which empowered the Banking Commissioner to regulate dealer participation detracts nothing from the recognition by the Supreme Court of Wisconsin of its power to deal with the subject.
From that case it is apparent that the Supreme Court of Wisconsin considers the regulation of dealer participation in the sales of retail installment contracts to be within the police power of the state, and it is significant that counsel in the instant case do not attack the constitutionality of the Eetail Installment Sales Act as a whole, thereby tacitly admitting that the provisions which they do question are but a part of a general plan of legislation in a field in which the government has a legitimate right to exercise some degree of control, i. e., they tacitly admit that the Eetail Installment Sales Act as a whole is directly related to the general health, welfare and morals in attempting to correct an abuse which directly affects the buying public.
Our concern herein is, therefore, restricted to a consideration of whether the provisions of Section 1317.08 in question bear a reasonable relation to the purpose sought to be effectuated by the General Assembly in enacting the Eetail Installment Sales Act, and whether such provisions are reasonable and nondiscriminatory.
*456 In considering the first question, we must determine the function expected of the Retail Installment Sales Act in order to determine whether the function of these particular provisions falls within and bears a substantial relation to the function of the chapter as a whole. If it does, and provided the provisions are not unreasonable or discriminatory, then they must be sustained, for it is not within the power of this court to determine further concerning the wisdom of such particular provisions. See Nebbia v. New York, supra; German Alliance Ins. Co. v. Lewis, Supt., 233 U. S., 389, 58 L. Ed., 1011, 34 S. Ct., 612, L. R. A. 1915C, 1189; County of Miami v. City of Dayton, 92 Ohio St., 215, 110 N. E., 726; and State, ex rel. Dickman, a Taxpayer, v. Defenbacher, Dir., 164 Ohio St., 142, 128 N. E. (2d), 59.
It is here noted that, although this appeal is based upon a trial de novo in the Court of Appeals, such trial de novo was “heard upon the transcript of the docket and journal entries, the original papers and pleadings, the transcript of evidence and a stipulation filed in this court [Court of Appeals], briefs and arguments of counsel.” We are free, therefore, to refer to any of the above.
Plaintiff’s counsel, in their opening statement to the trial court, described as follows their interpretation of the function of the act and plaintiff’s position regarding the particular provisions in question:
“The action is directed at the constitutionality of the one section of the Retail Installment Sales Act insofar as that section applies to the plaintiff and other automobile dealers similarly situated.
i i # # *
“ * * * Sales finance companies, as a rule, do not make direct loans to purchasers of cars. Ordinarily, they supply capital to automobile dealers on direct floor plan mortgages to finance the purchase of cars at the factory and further, and more important, insofar as this litigation is concerned, purchase from automobile dealers installment contracts, and chattel mortgages received by the automobile dealers for the sale of both new and used automobiles. # * *
a* # *
“Certain practices arose during the development of the *457 automobile industry so that in some states some regulation was deemed essential. This regulation generally consisted of so-called disclosure statutes, that is, laws requiring that details of the financial transaction involved in the purchase of automobiles on time be fully disclosed to the purchaser.
i C # # *
“The Ohio Retail Installment Sales Act, however, is more than a mere disclosure statute. Revised Code, Section 1317.06, provides maximum finance charges that may be charged a retail buyer of personal property on a retail installment sale. This section provides that a base finance charge at the rate of $8 per $100 per year may be charged on the principal balance of the retail installment contract. And further, that a certain service charge may also be made. The service charge is computed on the first six $50 units on the contract and may be charged each month of the term of the installment contract. The maximum service charge in any 12-month period is $21, so that it is frequently stated that the Ohio maximum rate is 8 per cent plus $21.
“* * * The provisions of Revised Code, Section 1317.06, fixing the maximum finance charge are not questioned or involved in this litigation. It is the position of your plaintiff that any interest of the public in the subject matter of the Retail Installment Sales Act is completely and adequately protected by the disclosure provisions of the Ohio act and by the provisions of the Ohio act fixing and determining a maximum finance charge. But the Ohio Retail Installment Sales Act contains another provision in Revised Code, Section 1317.08, which we contend is not for the benefit of the retail buyers of personal property on the installment sales plan or of the general public. We contend that this provision affects only retail sellers of personal property sold on an installment basis and violates the constitutional rights of such retail sellers. The provisions of Revised Code 1317.08 that I refer to prohibits the payment to and the receipt by the retail seller, on the sale of any retail installment contract, of an amount equal to the unpaid balance plus 2 per cent of the principal balance thereof. * * *
( i # # *
* * However, when said purchaser of an automobile *458 on time payments executes and delivers to plaintiff a note and mortgage in payment of said automobile, we contend tbat the note and mortgage is the property of this plaintiff. * * *
“As I have stated, most automobile dealers, including this plaintiff, because of limited amounts of capital, are unable to hold and retain chattel mortgages and notes and are forced to sell or discount said notes and chattel mortgages to banks, sales finance companies or other financial institutions. * * *”
To support his position plaintiff relies heavily on the case of Department of Financial Institutions v. Holt, 231 Ind., 292, 108 N. E. (2d), 629. In that case the Supreme Court of Indiana (considering legislation similar to Chapter 1317 except that it delegated to an administrative board the determination of the lawful extent of dealer participation), although recognizing, at page 306, that the legislation was generally a valid exercise of the police power, i. e., “some of the sections of the act are unquestionably aimed at the suppression of fraud,” agreed with plaintiff’s position that the provision allowing restrictions on the extent of dealer participation was an unrelated and unconstitutional interference with the dealer’s freedom of contract.
That case, however, dealt with the question as one of legislative price fixing, and the court found that such legislative “price fixing” was not related to a suppression of fraud and was, therefore, unconstitutional. We feel that the question here does not concern legislative “price fixing” as such, and that the Holt case is not pertinent, since it represents merely an excellent illustration of the determination of the Supreme Court of Indiana to refuse “to follow the ‘pattern’ or ‘drift’ of decisions of other jurisdictions which approve legislative price fixing. ’ ’
Still looking to the function of the Retail Installment Sales Act, let us now examine certain significant parts of the testimony of the plaintiff, keeping in mind that he had at the time of trial, in his words, “almost 14 years” experience in the automobile finance business (he was associated with Universal C. I. T.) and “just a little over four years” experience as an automobile dealer (new and used), and that he could speak with some degree of authority about the matter at hand,
*459 After answering that he arranged the financing of about 75 per cent of his credit sales, plaintiff testified, on cross-examination, as follows:
“Q. You say that you have been in the automobile business for about four years? A. Yes, sir.
“Q. And then in the sales finance business for about 14 years, so you have had about 18 years experience in the financing of used cars and new car dealers. Would you say that from your experience that the dealer does control the placing of credit by consumers from his business? A. Well, I would like to answer that question two ways; there are some dealers who do and there are some who don’t. When 1 was in the finance business, I used to, we will say, tell the dealer that he wasn’t controlling it lilce he could.
“Q. In other words, it is possible for a dealer to control a very high percentage of the credit transactions going through his business? A. He can control a majority of them, yes sir.
í i * # *
‘ ‘ Q. The other day I asked you this question: ‘Are you concerned with the .rate which a customer has to pay?’ And you answered: ‘No, not as it is today.’ Is that correct? A. That’s right.
“Q. Bid you are concerned with the amount of reserve which is paid to you! A. Yes, sir.
“Q. Do you attempt to sell the rates which you have to customers when they come in to buy a car? A. Well, we quote the rates.
“Q. Well, do you encourage him to let you arrange the financing on the car for him! A. Yes, sir.
“Q. And is that because you receive a certain percentage of the financing ivhen you arrange for it? A. That is part of the reason.
“Q. Do you do anything on the 24-month contract which you don’t do on a 12-month contract? A. I don’t believe so.
“Q. In other words, the service which you perform is the same regardless of the duration of the contract or the amount of interest involved1! A. Yes.” (Emphasis ours.)
Then on redirect examination plaintiff testified:
*460 “Q. (By Mr. Kramer) Mr. Teegardin, you were inquired of on cross-examination as to the manner in which you handled this business and the word 'control’ was used, the inference being that you control these people that you dealt with. What is the situation as to that! A. Well, it isn’t a matter of control, it is a matter of selling by a finance plan to the customer, the same as I sell him an automobile and the accessories that go on it.
“Q. Just the same as if you would sell him a radio instead of having a customer that didn’t want to buy a radio? A. Yes, sir, that’s right.” (Emphasis ours.)
It is our opinion that the following colloquy between plaintiff and defense counsel, on cross-examination, considered together with the other testimony of the plaintiff herein set out, does a great deal to destroy the illusion attempted to be created by plaintiff that the note and mortgage are ever the ‘ ‘ property of this plaintiff” in a true sense of the word. This testimony, binding on the plaintiff, indicates to the contrary that unless there has been some prearrangement with some financial institution, regarding each individual sale to a consumer, for the immediate transfer or assignment of the installment contract, no such contract is usually executed. The reason for this, as admitted by plaintiff, is that the dealer does not ordinarily have the financial resources necessary to hold the “paper” for collection himself.
The colloquy mentioned was as follows:
“Q. (By Mr. Lloyd) Who fixes the rate of interest which you charge on notes which are given you by your customersf Do you fix them, or are they fixed by the financial institution who subsequently buys the paper from you? A. Well, the rates are pretty well established. I don’t know ivhether you would say that I fix them, or the finance companies fix them.
“Q. Well, is there— A. I can charge any rate that I wish, as long as it is within compliance with the law.
“Q. Well, is there any prearrangement with the financial institution when you extend credit to a customer, in other words, do you know which finance company is going to buy a particular paper? A. I don’t always, specifically, which finance company is going to buy the paper.
*461 “Q. In the process of making the deal, do you determine some time while the customer is there, which company will eventually get it? A. Sometimes I do and sometimes I don’t.
“Q. You testified that you do business with two different institutions. Since they have different finance rates on used cars, especially, it would be necessary for you to determine some time during the time ivhen you have the customer there which institution is going to receive that paper, wouldn’t iti A. It wouldn’t necessarily, that could be determined at the time they take delivery of the automobile that they have purchased.
“Q. Well, some time before the transaction is completed, then, that question is resolved? A. Yes.” (Emphasis ours.)
Of all plaintiff’s testimony, however, the following is the most significant with respect to the legislative purpose in enacting the Retail Installment Sales Act, and the function that act is intended to perform:
“Q. Mr. Lloyd went into the question with you of the situation where, perhaps, you might take paper that had a rate of 4 per cent which, of course, would mean that you couldn’t sell it and get any reserve, is that right? A. That’s right.
“Q. And why wouldn’t you follow that procedure in your business, Mr. Teegardin?
“Mr. Lloyd: I object.
“Mr. Kramer: Well, I think they went into it, Your Honor.
“The Court: Well, I think the determination rests with the court. This question goes as to why you wouldn’t do that. I believe he testified that he could do it, however. Well, I think I will let him answer * * *.
“The Witness: Well, I could do it, but a dealer can’t do it and stay in business over a long period of time.
“Mr. Lloyd: I move the answer be stricken.
“The Court: Overruled.
“The Witness: Can I enlarge on that?
“The Court: I was just about to ask, * * * you mean by that that your two per cent reserve is a material factor in considering your income to transact business, is that what you mean by the answer?
“The Witness: Yes, sir, the reserve, or the profit we get from selling our paper, and it is historical and your national *462 figures will show that last year 60 per cent of the net income of the average dealer came from his finance profits.
“The Court: 60 per cent?
“The Witness. 60 per cent nationwide.
“Mr. Lloyd: I move the answer be stricken.
“The Court: Overruled.
U * * #
“The Court: Pardon me, just a minute, sir. Did I understand you to say * * * that 60 per cent figure you gave the court [is] of your profit or your gross income?
“The witness: Profit.” (Emphasis ours.)
Although somewhat lengthy, the quotations set out not only indicate but impel the conclusion that a retail automobile dealer could not exist as such without having an exceedingly close relationship with at least one financial institution regarding the immediate transfer or assignment of his “paper,” and that it is this interrelationship which bred the evils of hidden costs, “kick-backs,” excessive rebates or “packs” (included in the finance plan worked out by both businesses and “sold” by the dealer), which the General Assembly attempted to curb by the enactment of the Retail Installment Sales Act.
Prom this it becomes at once apparent that the function of the act is to control finance charges on retail installment sales, to compel a disclosure of such charges to the consumer and to separate the interest of the retail dealer from the interest of the financial institution in the profit resulting from the financing of a sale made by the dealer to a consumer, i. e., to prevent the retail dealer from being, in effect, a commission agent for the financial institution which has the finance plan with the most “padding.”
Plaintiff’s own testimony that he controls “75 per cent of his credit transactions” by “selling” his customers a finance plan by which he is directly benefited, as he would sell an automobile or an accessory thereto, and that as a representative of Universal C. I. T. he exhorted the dealers with whom he dealt in that capacity to continue to exercise more and more “control” over the placing of credit transactions, together with his testimony that a majority of the yearly profits made by automobile dealers nationwide results from such “control,” cer *463 tainly confirms the argument that a statutory restriction on the amount of a dealer’s participation in the profit resulting from such “control” is directly related to the function of the Retail Installment Sales Act of separating the interest of the retail dealer from the interest of the financial institution in the profit resulting from the financing of a sale made by a dealer to a consumer.
We next consider whether such 2 per cent limitation is reasonable and nondiscriminatory.
In the case of Direct Plumbing Supply Co. v. City of Dayton, 138 Ohio St., 540, 38 N. E. (2d), 70, 137 A. L. R., 1058, this court said:
“To be truly in the public welfare * * * and thus superior to private property rights, any legislation must be reasonable, not arbitrary, and must confer upon the public a benefit commensurate with its burdens upon private property. This general doctrine was comprehensively stated by this court in Froelich v. City of Cleveland, 99 Ohio St., 376, at 391, 124 N. E., 212: ‘It must be remembered that neither the state in the passage of general laws, nor the municipality in the passage of local laws, may make any regulations which are unreasonable. The means adopted must be suitable to the ends in view, they must be impartial in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation.’ And the final decision upon these questions of reasonableness and degree of interference — and the final setting of the balance between public welfare and private right — must in any system of constitutional government be the function of the judicial arm of government. State v. Boone, 84 Ohio St., 346, 95 N. E., 924, 39 L. R. A. (N. S.), 1015, Ann. Cas. 1912C, 683.”
In view of the conclusion we have reached as to the function of the Retail Installment Sales Act and that of Section 1317.08, a part thereof, it is apparent that the fact that the as-signee or transferee of the “paper” makes more or less profit on the transaction, according to the age of the automobile concerned, whether the “paper” is sold on a recourse or nonre-course basis or whether it is long- or short-term “paper,” is *464 immaterial to the purpose of the legislation. The General Assembly has, in its discretion, determined that, to further the purpose of separating the interest of the dealer and that of the financial institution in the profit resulting from the financing of sales made by the former, the dealer is to be limited to a flat maximum of compensation for “selling” the finance plan of a financial institution. There is no charge that such flat maximum is confiscatory or interferes with the dealer’s automobile business in any manner, and we cannot say that it is an unreasonable means of attaining the legislative end.
Nor can these provisions be found to be discriminatory, for in order for legislation to be discriminatory it must affect members of the same class differently. It is seen herein that in order for plaintiff, as a retail automobile dealer, to claim that I the provisions of Section 1317.08 here in question are discriminatory in that they restrict him in dealing with “his paper” while not restricting financial institutions in subsequent dealings with other persons regarding the same “paper,” it must be his contention that the facts that he arranges for the financing of a sale with a financial institution and for an instant holds “paper” made out to himself before transferring or assigning it to said financial institution, render Mm a bona fide financial institution entitled without discrimination to all the rights, privileges and immunities attaching to financial institutions, i. e., that he is one of their “class.”
The General Assembly, however, in enacting legislation requiring retail automobile dealers and financial institutions to be licensed under separate laws and answerable to separate state agencies, has, without being arbitrary, clearly considered each of said businesses as being in a separate class for certain purposes. The legislation at hand is merely another example of such separate classification, and, as we have said, it is not arbitrary.
Since, then, the provisions in question operate alike on all retail dealers in the transfer or assignment of their “paper” and on all transferees and assignees in their receipt of “paper” from such dealers, they cannot be said to be discriminatory.
It is our conclusion that:
I. The Retail Installment Sales Act is a “law relating to *465 the selling .* * * or regulation of sales of motor vehicles,” and a violation thereof may well subject the offender to a suspension or revocation of his license.
II. That part of Section 1817.08, Revised Code, which restricts the amount of participation of a retail dealer in the transfer or assignment of any retail installment contract is constitutional since:
1. Its function is substantially related to the accomplishment of a concededly valid legislative purpose, i. e., that of separating the interest of the retail dealer from the interest of the financial institution in the profit resulting from the financing of a sale of personal property made by the former, in order to curb the interaction and practices between the two which resulted in so many hidden charges that they amounted to a general fraud on the public.
2. Such provisions are neither unreasonable nor discriminatory in that they do not interfere with plaintiff in his business as a retail automobile dealer, are not confiscatory and affect all the members of both the business of retail automobile dealers and that of financial institutions, in their, transactions with the former, in the same manner, and the members of neither business may be considered to be in the same “class,” for the purpose of this legislation, as the members of the other.
It follows that the judgment of the Court of Appeals must be, and it hereby is, affirmed.

Judgment affirmed.

WeYGANDT, C. J., ZlMMERMAN, TaET and HERBERT, JJ., concur.
Stewart and Bell, JJ., dissent.